E-FILED
Tuesday, 10 April, 2018  01:56:25 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

**DANIEL R. LOZIER, II,**

      **Plaintiff,**

**vs.**

**QUINCY UNIVERSITY CORPORATION, CHRISTINE TRACY, SAM LATHROP, MARK BELL, and BRIAN HOLZGRAFE,**

      **Defendants.**

Case No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

NOW COMES Plaintiff, DANIEL R. LOZIER, II, by and through his attorneys, SHEEHAN & SHEEHAN, LAWYERS, P.C., and for his Complaint against Defendants QUINCY UNIVERSITY CORPORATION ("QU"), CHRISTINE TRACY ("Defendant Tracy"), SAM LATHROP ("Defendant Lathrop"), MARK BELL ("Defendant Bell"), and BRIAN HOLZGRAFE ("Defendant Holzgrafe") (all Defendants named herein are collectively referred to as "Defendants"), alleges as follows:

### Introduction

1.  This action concerns violations of Plaintiff's rights secured by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (hereinafter, "Title IX") as well as Defendants' violations of Plaintiff's rights under other federal and state laws arising from Defendants' callous, deliberately indifferent, hostile, and retaliatory responses to Plaintiff's participation and cooperation with QU's investigation into the QU intercollegiate Men's NCAA Division II Tennis Program and Head Tennis Coach, Defendant Holzgrafe. Defendants' violations of Plaintiff's rights protected by law created a hostile educational and athletic environment and resulted in a vindictive, threatening, and retaliatory suspension and ultimate

removal of Plaintiff from QU and the QU intercollegiate Men's NCAA Division II Tennis Program. Additionally, Defendants failed to abide by QU's contractual obligations to Plaintiff, sought to malign Plaintiff's character and reputation, disclosed private facts that Plaintiff provided in confidence, cast Plaintiff in a false light, invaded Plaintiff's privacy, and negligently supervised and retained Defendant Holzgrafe, all of which resulted in Plaintiff suffering tremendous past, present, and future physical and psychological pain, suffering, and impairment, humiliation, impaired educational and athletic capacity, and the loss of valuable athletic and academic scholarships.

## Jurisdiction and Venue

2.      This Court has subject matter jurisdiction over the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because this litigation involves matters of federal law, specifically, claims made under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

3.      This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the facts forming the basis of such claims arise out of the same nucleus of operative facts that form the basis of the federal claims.

4.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the relevant facts giving rise to this case occurred in this district.

## Parties

5.      Plaintiff, Daniel R. Lozier, II, is and was, at all times relevant hereto, a citizen of the United States of America who enjoyed all the rights, freedoms, and liberties as afforded under the Constitution of the United States of America and the Laws of the State of Illinois. Plaintiff was enrolled as a student at QU for the 2016-2017 academic calendar year, and was

under academic and athletic scholarship with QU, providing his talents to QU in its NCAA Division II Men's Tennis Program during that time.

6.     QU is, and has been at all times relevant hereto, a private, Catholic, independent, liberal arts institution organized as an Illinois not-for-profit corporation that provides, operates, maintains and controls facilities and employs individuals in higher education in Quincy, Illinois.

7.     QU is, and was at all times relevant hereto, a private university that provides, operates, maintains, and controls an NCAA Division II Department of Intercollegiate Athletics/Athletic Director, including an NCAA Division II Men's Tennis Program and team (hereinafter, the "Men's Tennis Program" or "Program"), which has been and continues to be overseen, managed, coached, directed, and/or controlled by a Vice President of Intercollegiate Athletics, Defendant Bell, and a head tennis coach and their staffs. At all times relevant hereto, QU received and continues to receive federal assistance as described in and defined by Title IX.

8.     At all times relevant hereto, QU acted by and through its agents, servants, employees, and representatives, all of whom were acting in the course and scope of their respective agency or employment and/or in the promotion of QU's business, mission, or affairs.

9.     Upon information and belief, Defendant Tracy is a resident of the State of Illinois, and, at all times relevant hereto, was the Dean of Students and Academic Success at QU. Defendant Tracy is joined in her individual and representative capacity.

10.     Upon information and belief, Defendant Lathrop is a resident of the State of Illinois, and, at all times relevant hereto, was the Director of Safety and Security and served as the Title IX Investigator at QU. Defendant Lathrop is joined in his individual and representative capacity.

11.     Upon information and belief, Defendant Bell is a resident of the State of Illinois, and, at all times relevant hereto, was the Vice President of Intercollegiate Athletics and served as Athletic Director at QU. In such capacity, Defendant Bell directly oversaw, managed, supervised, and controlled QU's men's and women's intercollegiate sports programs and head coaches, assistant coaches, and QU student-athletes (including Plaintiff). Defendant Bell is joined in his individual and representative capacity.

12.     Upon information and belief, Defendant Holzgrafe is a resident of the State of Illinois and, at all times relevant hereto, was hired by QU on April 20, 2015 and acted in the capacity of Head Tennis Coach of the Men's Tennis Program and Women's Tennis Program at QU until his resignation in May 2017. In such capacity, Defendant Holzgrafe directly managed, supervised, and controlled his assistant coaches, including Assistant Coach Chris Bueler, and student-athletes. Defendant Holzgrafe is joined in his individual and representative capacity.

**Allegations Common to All Counts of the Complaint**

13.     Plaintiff repeats and re-alleges Paragraphs 1 through 12 above as if fully set forth herein.

14.     Plaintiff was a highly touted high school tennis recruit who was recruited by several NCAA tennis programs out of high school.

15.     In 2015, Defendant Holzgrafe recruited Plaintiff to play tennis at QU and QU, through Defendant Holzgrafe, offered Plaintiff a lucrative package of athletic and academic scholarships whereby QU would and did provide Plaintiff with financial assistance in the form of costs of tuition, costs of room and board, and costs of certain educational materials with the expectation of continuation of such arrangement for the successive academic years until Plaintiff graduated and/or exhausted or otherwise relinquished his NCAA eligibility.

16.    Plaintiff's scholarship offer from Coach Holzgrafe and QU totaled $27,000.00 per school year and was allocated as follows: (1) $11,000.00 per year for QU Men's Tennis Grant; and (2) $16,000.00 per year for the Anthony of Padua Scholarship.

17.    On November 16, 2015, Plaintiff signed a National Letter of Intent to play tennis at QU, thereby accepting Defendant Holzgrafe and QU's scholarship offers as detailed above.

18.    Plaintiff was offered the opportunity to play intercollegiate tennis at other colleges and universities, but chose QU because of the promises made by QU and Coach Holzgrafe about the Men's Tennis Program.

19.    Plaintiff received assurances from QU and Defendant Holzgrafe that Plaintiff's scholarship package would be renewed each year and that the amount of the scholarships would likely increase over time.

20.    Plaintiff enrolled at QU in the Fall 2016 semester and was an active and contributing member of the Men's Tennis Program.

21.    Prior to and during Plaintiff's enrollment at QU, certain policies and procedures were in place that impacted students and student-athletes at QU, all of which were relied upon by Plaintiff.

22.    As a freshman member of the Men's Tennis Program and throughout the 2016-2017 academic year and tennis season, Plaintiff regularly started singles and doubles matches, remained in good standing, and was a valuable contributor to the team until on or about April 11, 2017.

23.    Prior to and/or during the 2016-2017 academic year and/or tennis season, and continuing thereafter until the end of the 2016-2017 academic year, Defendant Holzgrafe began

and continued to engage in misconduct while acting under color of law and within the scope of his employment which had the effect creating a hostile environment within the Program.

24.    Specifically, the following misconduct occurred:

a.   Defendant Holzgrafe regularly referred to Plaintiff as a "privileged white boy from the South";

b.   On information and belief, during the Program's spring break trip to Fort Myers, Florida in March 2017, and while Defendant Holzgrafe was driving a rental van full of players, Defendant Holzgrafe was caught on video playing a ukulele, steering the van with his knees, and otherwise placing the student-athletes in danger;

c.   On information and belief, also during the Program's spring break trip to Fort Myers, Florida in March 2017, Defendant Holzgrafe was involved in a hit-and-run accident in which the van Defendant Holzgrafe was driving side-swiped another vehicle, but Defendant Holzgrafe did not stop or otherwise report the accident;

d.   On information and belief, Defendant Holzgrafe instructed his players not to tell anyone about the hit-and-run incident and, instead, insisted that his players maintain that the van was hit while parked in a parking lot; and

e.   A person or persons other than Plaintiff made allegations that Defendant Holzgrafe had an inappropriate sexual relationship with a female member of the Women's Tennis Program.

25.     On information and belief, QU was made aware of certain allegations of an intimate sexual relationship between Coach Holzgrafe and a female member of the Women's Tennis Program on or about April 10, 2017.

26.     Thereafter, QU commenced an investigation into the sexual harassment allegations, purportedly to comply with Title IX, and Defendant Holzgrafe was the main subject of QU's investigation (hereinafter, "Title IX Investigation").

27.     Defendant Tracy, the Dean of Students and Academic Success, and Defendant Lathrop, the Director of Safety and Security and QU's designated "Title IX Investigator," administered and conducted the Title IX Investigation concerning Defendant Holzgrafe.

28.     Despite the seriousness of the allegations associated with the Title IX Investigation, QU permitted Defendant Holzgrafe to remain in a position of authority as head coach of the Men's and Women's Tennis Programs until the end of the 2016-2017 academic year and tennis season, including allowing him to continue driving the teams to tennis matches and allowing Defendant Holzgrafe to travel alone with the Women's Tennis Program for an overnight trip to Drury University in Springfield, Missouri.

29.     As part of the Title IX Investigation into the allegations made involving Defendant Holzgrafe, Defendant Tracy and Defendant Lathrop interviewed several student-athletes, including Plaintiff.

30.     Defendant Tracy and Defendant Lathrop arrived at tennis practice on April 11, 2017 and requested Coach Holzgrafe's permission to interview Plaintiff.

31.     Plaintiff was ordered to leave practice and complied with the request for interview associated with the Title IX Investigation.

32.    QU never provided Plaintiff with any materials or documents concerning Title IX, his rights, or QU's policies and procedures concerning the Title IX Investigation.

33.    Prior to, during, and after Plaintiff's interview with Defendant Tracy and Defendant Lathrop in the course of the Title IX Investigation, Plaintiff was assured that the information he provided would be held in confidence, only disclosed on a need-to-know basis, the sources of information would remain anonymous, and that the information provided would not be the basis for retaliation against him.

34.    In reliance on the assurances made by Defendant Tracy and Defendant Lathrop, Plaintiff disclosed all information he knew that he considered pertinent to the Title IX Investigation and to the questions he was asked by Defendant Tracy and Defendant Lathrop.

35.    Specifically, after Plaintiff was asked what he had heard concerning numerous subjects, Plaintiff disclosed to Defendant Tracy and Defendant Lathrop the following:

   a.  Plaintiff's concerns about excessive alcohol use and drug abuse among the Men's and Women's Tennis Program;

   b.  Information that Assistant Coach Chris Bueler provided drugs and/or alcohol to members of the Men's Tennis Program and that Defendant Holzgrafe had knowledge thereof;

   c.  The incident involving Defendant Holzgrafe playing a ukulele and steering a rental van with his knees;

   d.  The hit-and-run incident involving Defendant Holzgrafe in which the van Defendant Holzgrafe was driving side-swiped another vehicle, but Defendant Holzgrafe did not stop or otherwise report the accident and instead encouraged witnesses to say the van was hit while parked;

    e.   The string of text messages within the group text among the QU men's tennis players regarding Defendant Holzgrafe's potential dismissal as coach; and

    f.   The conversation Plaintiff had with a tennis teammate after class on April 10, 2017 in which the teammate revealed to Plaintiff certain allegations that Defendant Holzgrafe had an intimate sexual relationship with a member of the Women's Tennis Program.

36.    Plaintiff returned to practice immediately after the interview with Defendant Tracy and Defendant Lathrop concluded.

37.    Subsequent to Plaintiff's participation in the Title IX Investigation, the substance of the information he shared in confidence to Defendant Tracy and Defendant Lathrop became well known throughout the Men's and Women's Tennis Programs.

38.    Defendants had in place inadequate disciplinary and investigative systems, which, rather than protect those individuals engaging in protected activities, created an environment more likely to lead to retaliation.

39.    Upon Plaintiff's arrival back to practice immediately following Plaintiff's interview with Defendant Tracy and Defendant Lathrop, and in the presence of other teammates, Defendant Holzgrafe and Assistant Coach Chris Bueler, while acting under color of law and within the scope of their employment, berated and verbally attacked Plaintiff in response to Plaintiff's participation and cooperation in the Title IX Investigation.

40.    In further response to Plaintiff's participation and cooperation in the Title IX Investigation, Defendant Holzgrafe, while acting under color of law and within the scope of his employment, then informed Plaintiff, in the presence of other teammates, that he was kicked off the tennis team.

41.     Defendant Holzgrafe subsequently sent Plaintiff a series of text messages, which, in part, read as follows:

    a.  On April 11, 2017 at 4:54 PM, Defendant Holzgrafe texted Plaintiff and stated, "Why would you do this? What have I done to deserve this terrible lie?"

    b.  On April 12, 2017 at 9:35 AM, Defendant Holzgrafe, while acting under color of law and within the scope of his employment, texted Plaintiff and stated, "Until this investigation concludes, you will suspend all activities with the men's tennis team here at QU. Please avoid any interaction or communication with the tennis teams."

42.     Upon receipt of the April 12, 2017 9:35 AM text message from Defendant Holzgrafe, QU, through Defendant Holzgrafe, who was acting under color of law and within the scope of his employment, arbitrarily suspended Plaintiff from the Men's Tennis Program.

43.     Plaintiff was not again permitted to resume activities with the Men's Tennis Program, was forced to endure a blatantly hostile educational and athletic environment and remain in isolation, and was arbitrarily banned from the team's remaining tennis matches, conference tournament, and end-of-season banquet, all because of, and in retaliation for, his participation in the Title IX Investigation.

44.     Plaintiff never again was welcomed back to the Program and was either constructively or actually removed from the Program in retaliation for his cooperation with the Title IX Investigation.

45.     Plaintiff was advised by QU that he should complete the remainder of the semester online from a remote location off the QU campus.

46.     On information and belief, and in further retaliation for Plaintiff's cooperation with the Title IX Investigation, Defendant Holzgrafe, who was acting under color of law and within the scope of his employment, began a campaign to humiliate, malign, and discredit Plaintiff whereby Defendant Holzgrafe, who was acting under color of law and within the scope of his employment, publicly and/or privately addressed Plaintiff in such a manner that was designed to embarrass, denigrate, demoralize, and demean Plaintiff and otherwise acted in ways to discourage Plaintiff from continuing to participate in the Program and team, including on one or more occasions referencing personal and confidential medical conditions of Plaintiff that are protected from disclosure by federal and state law.

47.     On or about April 12, 2017, Plaintiff complained to Defendant Lathrop about a teammate drawing pictures during class that depicted Plaintiff as a "snake" and a "rat".

48.     The above-described conduct constituted and created a hostile educational environment and QU had an affirmative duty to protect Plaintiff from retaliation.

49.     QU and Defendant Holzgrafe were actually aware of the hostile educational environment and retaliatory acts, were in a position to address the hostile educational environment and retaliatory acts, were in a position to take measures to end them, and were deliberately indifferent to the hostile educational environment and retaliatory acts and the consequences such events had on Plaintiff.

50.     Additionally, Plaintiff believes that, after a reasonable opportunity for further investigation or discovery, he will likely have evidentiary support that Defendant Bell and/or Phil Conover and/or Robert Gervasi were actually aware of the hostile educational environment and retaliatory acts, were in a position to address the hostile educational environment and retaliatory acts, were in a position to take measures to end them, and were deliberately

indifferent to the educational environment and retaliatory acts and the consequences such events had on Plaintiff..

51.     As the proximate result of the above-referenced hostile educational environment and/or intentional discrimination and/or retaliation occurring as a result of the aforementioned statements, misconduct, and/or campaign of QU and Defendant Holzgrafe, who was acting under color of law and within the scope of his employment with QU, Plaintiff suffered, and will continue to suffer in the future, injuries of a personal and pecuniary nature.

### COUNT I
### Title IX – Retaliation
### *(Against QU)*

52.     Plaintiff repeats and re-alleges Paragraphs 1 through 51 above as if fully set forth herein.

53.     This claim is brought for retaliation under Title IX and its interpretative regulations, 34 C.F.R. §106.71, which incorporates 34 C.F.R. § 100.7(e) of Title VI of the Civil Rights Act of 1964.

54.     Title IX prohibits discrimination on the basis of sex in education programs or activities operated by recipients of federal financial assistance. 20 U.S.C. § 1681.

55.     The interpretative regulations of Title IX state: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder." 34 C.F.R. § 107(e).

56.    QU receives federal financial assistance and the benefits therefrom. Therefore, all programs and activities at QU, including its NCAA Division II Department of Intercollegiate Athletics, are subject to the requirements of Title IX. 20 U.S.C. § 1681, 20 U.S.C. § 1687.

57.    QU owes a duty to Plaintiff to provide and ensure an educational environment free from discrimination and retaliation and to enforce the rules, regulations, policies, procedures, and laws necessary to protect Plaintiff from acts of discrimination and retaliation.

58.    Retaliation against individuals because they complain of sex discrimination is "intentional conduct that violates the clear terms of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005).

59.    A plaintiff claiming retaliation under Title IX must establish (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

60.    Plaintiff engaged in a protected activity by cooperating and answering questions in an interview pursuant to QU's Title IX Investigation.

61.    Defendants were aware of Plaintiff's participation in this protected activity because the investigation was administered by QU.

62.    Plaintiff suffered adverse school-related action when QU, through Defendant Holzgrafe, informed Plaintiff he was kicked off the team, suspended Plaintiff, and banned Plaintiff from any and all interaction with the Men's Tennis Program.

63.    Further, QU, through Defendant Holzgrafe, instructed other members of the Men's and Women's Tennis Programs not to associate with Plaintiff following his interview

pursuant to the Title IX Investigation and Plaintiff was effectively ostracized by other teammates.

64.      These actions were materially adverse to Plaintiff because they excluded him from the Men's Tennis Program, severely limited his ability to continue his academic progress in a natural campus setting at QU, and deprived him of other educational, athletic, and social opportunities and benefits.

65.      This adverse school-related action occurred within minutes of Plaintiff engaging in a protected activity.

66.      Plaintiff reported this retaliatory conduct to QU, Defendant Lathrop, and Defendant Tracy. Plaintiff's parents also reported this retaliatory conduct to Phil Conover.

67.      Defendants never reinstated Plaintiff or otherwise took appropriate remedial action, thereby exhibiting deliberate indifference toward the retaliatory actions suffered by Plaintiff.

68.      Reporting incidents and/or cooperating with Title IX investigations is integral to Title IX enforcement and retaliation protections are designed to preserve the integrity and effectiveness of the enforcement process itself.

69.      Accordingly, the merits of any underlying complaint of sex discrimination are irrelevant in assessing a retaliation complaint.

70.      Retaliation claims have their own remedial purpose in that they seek to ensure that rights created under a federal civil rights statute do not go unenforced for fear of adverse official reaction.

71.     The purpose of retaliation claims is undercut if recipients are allowed to retaliate against persons subject to their authority who publicly object to discrimination or otherwise cooperate with investigations into alleged violations.

72.     As a direct and proximate result of Defendants' retaliation, Plaintiff sustained and continues to sustain injuries for which he is entitled to be compensated, including but not limited to: past, present, and future physical and psychological pain, suffering, and impairment; medical bills, counseling, and other costs and expenses for past and future medical and psychological care; and impaired educational and athletic capacity.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendant, QUINCY UNIVERSITY CORPORATION, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees and costs of this suit on such judgment pursuant to 42 U.S.C. § 1988(b) and Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

## COUNT II
### Title IX – Hostile Educational Environment
#### *(Against QU)*

73.     Plaintiff repeats and re-alleges Paragraphs 1 through 72 above as if fully set forth herein.

74.     This is a Title IX hostile educational environment claim, which is governed by traditional Title VII of the Civil Rights Act of 1964 jurisprudence.

75.     A Title IX plaintiff must show that he subjectively perceived the educational environment to be hostile or abusive and that the educational environment was objectively permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive

to alter the conditions of his educational environment. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003).

76.     After Plaintiff cooperated with the Title IX Investigation, Plaintiff considered his educational environment to be hostile because he was subjected to ridicule, harassment, and intimidation, all of which is alleged herein.

77.     Based on the allegations contained herein, Plaintiff's educational environment was objectively hostile and effectively barred Plaintiff's access to QU's educational and athletic opportunities and benefits.

78.     At all times relevant hereto, Phil Conover, Robert Gervasi, and Defendant Bell were agents or representatives of QU.

79.     As agents or representatives of QU, Phil Conover, Robert Gervasi, and Defendant Bell exercised supervisory control over Defendant Holzgrafe.

80.     As agents or representative of QU, Phil Conover, Robert Gervasi, and Defendant Bell had authority to discipline or otherwise take appropriate remedial action against Defendant Holzgrafe.

81.     On or about April 12, 2017, QU, through Phil Conover, acquired actual knowledge of the retaliatory actions of Defendant Holzgrafe when Phil Conover engaged in e-mail and phone correspondence with Plaintiff's father.

82.     On or about April 12, 2017, QU, through Defendant Lathrop, acquired actual knowledge of the retaliatory actions of Defendant Holzgrafe and other members of the Men's Tennis Program against Plaintiff when Plaintiff notified Defendant Lathrop of such by text message.

83.     At all relevant times after participating in the Title IX Investigation on April 11, 2017, Plaintiff was subjected to and forced to endure a hostile educational environment resulting from the retaliatory actions of QU through Defendant Holzgrafe.

84.     QU was deliberately indifferent to the rights and safety of Plaintiff in that QU failed to take timely corrective action regarding these retaliatory actions, failed to prevent other student-athletes and individuals from further harassing and intimidating Plaintiff, and otherwise failed to protect Plaintiff from retaliation.

85.     As a direct and proximate result of the hostile educational environment QU subjected Plaintiff to, Plaintiff sustained and continues to sustain injuries for which he is entitled to be compensated, including but not limited to: past, present, and future physical and psychological pain, suffering, and impairment; medical bills, counseling, and other costs and expenses for past and future medical and psychological care; and impaired educational and athletic capacity.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendant, QUINCY UNIVERSITY CORPORATION, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees and costs of this suit on such judgment pursuant to 42 U.S.C. § 1988(b) and Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

### COUNT III
### Intentional Infliction of Emotional Distress
### *(Against QU and Defendant Holzgrafe)*

86.     Plaintiff repeats and re-alleges Paragraphs 1 through 85 above as if fully set forth herein.

87.    QU, through Defendant Holzgrafe, and Defendant Holzgrafe engaged in extreme and outrageous conduct directed toward Plaintiff, including but not limited to: threatening Plaintiff's status as a member of the Men's Tennis Program; suspending and banning Plaintiff from the Men's Tennis Program for participating in the Title IX Investigation; labeling Plaintiff as the source of the complaints which triggered the Title IX Investigation; publicizing private, confidential information about Plaintiff obtained in the course of his position as head tennis coach at QU; and otherwise criticizing and ridiculing Plaintiff in an effort to ostracize him among his peers and teammates.

88.    QU and/or Defendant Holzgrafe's retaliatory actions were done willfully, maliciously, outrageously, deliberately, and purposefully with intention and the result was the infliction of severe emotional distress upon Plaintiff.

89.    QU and/or Defendant Holzgrafe's retaliatory actions were carried out with reckless disregard of and indifference to the high probability of causing Plaintiff severe emotional distress.

90.    Plaintiff did in fact suffer severe emotional distress as a result of QU and/or Defendant Holzgrafe's retaliatory actions and Plaintiff continues to seek professional medical care for his severe emotional distress caused by these retaliatory actions.

91.    As a direct and proximate result of the severe emotional distress QU and/or Coach Holzgrafe inflicted upon Plaintiff, Plaintiff sustained and continues to sustain injuries for which he is entitled to be compensated, including but not limited to: past, present, and future physical and psychological pain, suffering, and impairment; medical bills, counseling, and other costs and expenses for past and future medical and psychological care; and impaired educational and athletic capacity.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

## PLAINTIFF DEMANDS TRIAL BY JURY.

### COUNT IV
### Negligent Infliction of Emotional Distress
#### *(Against QU, Defendant Tracy, Defendant Lathrop, Defendant Bell and Defendant Holzgrafe)*

92.    Plaintiff repeats and re-alleges Paragraphs 1 through 91 above as if fully set forth herein.

93.    QU owed duties to Plaintiff, including, without limitation, a duty of reasonable care in providing reasonable procedures, policies, and accommodations to ensure parties interviewed in the course of a Title IX investigation remain free from harm and retaliation.

94.    Plaintiff reasonably relied upon QU's duty to protect him from harm and retaliation and participated in good faith with the Title IX Investigation at QU's request.

95.    QU breached its duty of care in multiple ways, including, without limitation:

  a.  QU, through Defendant Tracy and Defendant Lathrop, arrived at tennis practice to request, in front of Defendant Holzgrafe, the main subject of the investigation, and the rest of the tennis team, that Plaintiff be interviewed;

  b.  Interviewing Plaintiff during practice and permitting Plaintiff to return to practice;

  c.  Permitting Defendant Holzgrafe to remain in a position of authority over Plaintiff and the Men's and Women's Tennis Programs;

d.  Permitting Defendant Holzgrafe to discipline, suspend, and terminate Plaintiff from the Men's Tennis Program;

e.  Failing to adequately supervise Defendant Holzgrafe in the midst of a contentious investigation into allegations involving sexual misconduct with a member of the Women's Tennis Program;

f.  Failing to take reasonable care in selecting, training, and supervising competent and impartial Title IX coordinators, Title IX investigators, and related staff; and

g.  Failing to adhere to QU's own procedures and policies regarding the Title IX Investigation.

96.    Such breach of duty created an unreasonable risk of causing Plaintiff to suffer severe emotional distress.

97.    As a direct and proximate result of the above conduct, Plaintiff sustained and continues to sustain injuries for which he is entitled to be compensated, including but not limited to: past, present, and future physical and psychological pain, suffering, and impairment; medical bills, counseling, and other costs and expenses for past and future medical and psychological care; and impaired educational and athletic capacity.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION, CHRISTINE TRACY, SAM LATHROP, MARK BELL, and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

**COUNT V**
**Breach of Contract**
***(Against QU)***

98.     Plaintiff repeats and re-alleges Paragraphs 1 through 97 above as if fully set forth herein.

99.     QU created express and/or implied contracts with Plaintiff when Plaintiff accepted an academic and athletic scholarship offer, accepted an offer of admission, and paid tuition and fees to QU.

100.    At all times relevant hereto, a contractual relationship existed between QU and Plaintiff through Plaintiff's matriculation as a student-athlete at QU, and through QU's policies and procedures governing the student conduct process, including, without limitation, the policies and procedures contained in the Quincy University Student Handbook 2016-2017 ("Handbook") and the Quincy University Athletics 2016-2017 Compliance Packet ("Compliance Packet"), and related terms and provisions in bulletins, circulars, and online website information and regulations made available to Plaintiff as a tuition-paying student and NCAA student-athlete.

101.    On his part, Plaintiff fully performed under his contracts with QU, paid his tuition when due, remained in good standing academically, and was an active and contributing member of the Men's Tennis Program.

102.    QU's policies contained in the Handbook provide for certain procedures when QU receives notice of sexual misconduct.

103.    Specifically, the Handbook obligates QU, through its Title IX Coordinator and/or Title IX Investigator, to "take reasonable interim steps to avoid a hostile environment…" and initiate the Community Standards Process outlined in the Handbook.

104.    QU's policies contained in the Handbook for certain procedures when QU receives notice of harassment, which is defined as "…the act of intentionally creating a hostile educational or living environment."

105.    Further, the Handbook provides that "a hostile environment exists when a complainant is unable to attend or expresses discomfort in attending classes or participating fully in other University functions due to the offensive, intimidating, or oppressive atmosphere generated by the alleged perpetrator."

106.    Specifically, the Handbook states allegations of harassment will be investigated and adjudicated through the Community Standards Process outlined in the Handbook.

107.    On information and belief, QU breached its contract with Plaintiff by failing to adhere to the express provisions of the Handbook, including not following the Community Standards Process outlined in the Handbook, and otherwise permitting and condoning a hostile educational environment which resulted in an offensive, intimidating, and oppressive atmosphere for Plaintiff.

108.    The Handbook also prohibits retaliation with an "anti-retaliation statement."

109.    QU breached its contract with Plaintiff by permitting Defendant Holzgrafe and other individuals to retaliate against Plaintiff after Plaintiff complied with the Title IX Investigator at the demand of QU.

110.    Additionally, the Handbook addresses suspensions and the mandatory process that must be followed before a student is suspended. The Handbook defines "suspension" as "a separation from the University for a student found responsible of a severe and/or multiple Community Standards violation/s and/or repeated violations."

111.    The Compliance Packet contains a "Code of Ethics for Student-Athletes" whereby student-athletes are required to agree to certain rules and regulations.

112.    The "Code of Ethics for Student-Athletes" states that sanctions may be administered by the athletic department athletic advisory committee through QU's judicial process, which purportedly is the Community Standard Process.

113.    QU breached its contract with Plaintiff by arbitrarily suspending Plaintiff from the Men's Tennis Program and effectively from the University without following the Code of Ethics for Student-Athletes as stated in the Compliance Packet and the Community Standards Process.

114.    QU was required to act in accordance with the aforementioned policies and procedures in addressing the allegations of sexual misconduct and in conducting the Title IX Investigation.

115.    For the reasons set forth herein, QU materially breached its contracts with Plaintiff by failing to comply with QU's policies and procedures in the course of the Title IX Investigation and by arbitrarily, capriciously, and in bad faith disregarding its contractual duties to Plaintiff throughout the Title IX Investigation.

116.    Plaintiff is entitled to recover damages for QU's breach of the express and/or implied contractual obligations described herein.

117.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendant, QUINCY UNIVERSITY CORPORATION, for damages in an amount to be proven

at trial, plus attorneys' fees (if applicable) and costs of this suit pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

### COUNT VI
### Estoppel and Detrimental Reliance
### *(Against QU)*

118.   Plaintiff repeats and re-alleges Paragraphs 1 through 117 above as if fully set forth herein.

119.   Plaintiff pleads this Count VI in the alternative to Count V.

120.   QU's various policies and procedures constitute representations and promises that QU should have reasonably expected to induce action or forbearance by Plaintiff.

121.   QU expected or should have expected Plaintiff to accept its academic and athletic scholarship offer and its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges that were aggressively recruiting him based on its express and implied promises that QU would not tolerate, and Plaintiff would not suffer, harassment, retaliation, and a hostile educational environment.

122.   Plaintiff reasonably relied to his detriment on these express and implied promises and representations made by QU.

123.   Based upon QU's representations and Plaintiff's reliance thereon, QU is estopped from denying the existence of a contract.

124.   As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendant, QUINCY UNIVERSITY CORPORATION, for damages in an amount to be proven

at trial, plus attorneys' fees (if applicable) and costs of this suit pursuant to Federal Rule of Civil

Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

## PLAINTIFF DEMANDS TRIAL BY JURY.

### COUNT VII
### Defamation
### *(Against QU, Defendant Lathrop and Defendant Holzgrafe)*

125.     Plaintiff repeats and re-alleges Paragraphs 1 through 124 above as if fully set

forth herein.

126.     On information and belief, Defendant Lathrop, while acting under color of law

and within the scope of his employment, disclosed to Defendant Holzgrafe that Plaintiff was the

source of the allegations that triggered the Title IX Investigation.

127.     After Plaintiff cooperated with the Title IX Investigation on April 11, 2017, on

information and belief, Defendant Holzgrafe, while acting under color of law and within the

scope of his employment, made various statements about Plaintiff to members of the Men's and

Women's Tennis Program and other third parties.

128.     On information and belief, Defendant Holzgrafe's statements to others about

Plaintiff related to Plaintiff being the source of the initial complaint that triggered the Title IX

Investigation and otherwise sought to malign, discredit, humiliate, and intimidate Plaintiff.

129.     Plaintiff was not the source of the initial complaint that trigged the Title IX

Investigation, and as such, Defendant Holzgrafe's statements to others about Plaintiff were false.

130.     No records, documents, or other evidence support Defendant Holzgrafe's

statements about Plaintiff.

131.     Defendant Holzgrafe and/or Defendant Lathrop knew the statements he made to

others about Plaintiff were false.

132.     Defendant Holzgrafe and/or Defendant Lathrop made the statements about Plaintiff to others with reckless disregard of the truth or falsity of the statements about Plaintiff.

133.     Defendant Holzgrafe and/or Defendant Lathrop acted negligently in failing to ascertain whether the statements about Plaintiff were true or false before making them.

134.     The statements made by Defendant Holzgrafe and/or Defendant Lathrop about Plaintiff to others prejudice Plaintiff and/or impute a lack of ability in Plaintiff's trade, meaning the statements are defamatory *per se*.

135.     Defendant Holzgrafe's and/or Defendant Lathrop's statements about Plaintiff caused such harm to Plaintiff's reputation that it lowered Plaintiff in the eyes of the QU community and deterred Plaintiff's teammates and peers at QU from associating with him.

136.     As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION, SAM LATHROP, and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

### COUNT VIII
### Public Disclosure of Private Facts
### *(Against QU, Defendant Tracy, Defendant Lathrop and Defendant Holzgrafe)*

137.     Plaintiff repeats and re-alleges Paragraphs 1 through 136 above as if fully set forth herein.

138.    In light of 34 C.F.R. § 107(e) and the assurances Plaintiff received from Defendant Tracy and Defendant Lathrop before Plaintiff's interview in the Title IX Investigation, Plaintiff expected that the information he provided in the course of the Title IX Investigation would remain confidential and disclosed only on a need-to-know basis.

139.    The information that Plaintiff provided to the investigators was private and provided for the limited purpose of the Title IX Investigation.

140.    On information and belief, the private information provided by Plaintiff in the Title IX Investigation was publicly disclosed to another individual or other individuals.

141.    Almost immediately after Plaintiff participated in the Title IX Investigation with Defendant Tracy and Defendant Lathrop, the information Plaintiff provided in confidence in the course of the Title IX Investigation was known throughout the Men's and Women's Tennis Programs.

142.    Text messages sent by Defendant Holzgrafe to Plaintiff almost immediately after Defendant Tracy and Defendant Lathrop interviewed Plaintiff show that Defendant Holzgrafe, the main subject of the Title IX Investigation, received information about what Plaintiff shared to Defendant Tracy and Defendant Lathrop in the course of the Title IX Investigation.

143.    On information and belief, and in further effort to malign, discredit, embarrass, and humiliate Plaintiff, Defendant Holzgrafe disclosed certain private confidential medical information about Plaintiff to other members of the Men's and/or Women's Tennis Programs.

144.    The disclosure of Plaintiff's private information was made to a person or persons who have a special relationship with Plaintiff in that that person or those persons were teammates, peers, or otherwise affiliated with QU.

145.    The disclosure of Plaintiff's private information concerned extremely sensitive information, was not of legitimate public concern, and is highly offensive.

146.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION, CHRISTINE TRACY, SAM LATHROP, and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

**COUNT IX**
**False Light**
***(Against QU, Defendant Lathrop and Defendant Holzgrafe)***

147.    Plaintiff repeats and re-alleges Paragraphs 1 through 146 above as if fully set forth herein.

148.    On information and belief, Defendant Lathrop, while acting under color of law and within the scope of his employment, disclosed to Defendant Holzgrafe that Plaintiff was the source of the allegations that triggered the Title IX Investigation.

149.    Defendant Lathrop also prepared an investigative report in the course of the Title IX Investigation that is misleading, inaccurate, and discredits Plaintiff.

150.    On information and belief, Defendant Holzgrafe then made statements about Plaintiff to others.

151.    As a result of Defendant Holzgrafe' and/or Defendant Lathrop's statements about Plaintiff to others, Plaintiff was labeled as a "snake," "rat," and the source of the Title IX Investigation among his teammates and peers at QU.

152.    Defendant Holzgrafe's and/or Defendant Lathrop's statements about Plaintiff cast Plaintiff in a false light among his teammates and peers at QU.

153.    The false light in which Defendant Holzgrafe and/or Defendant Holzgrafe and/or Defendant Lathrop placed Plaintiff is highly offensive to a reasonable person.

154.    Defendant Holzgrafe and/or Defendant Lathrop acted with actual malice in that he either knew the statements made to others about Plaintiff were false or he acted with reckless disregard for whether the statements were true or false.

155.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION, SAM LATHROP, and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

### COUNT X
### Intrusion upon Seclusion
### *(Against QU, Defendant Lathrop and Defendant Holzgrafe)*

156.    Plaintiff repeats and re-alleges Paragraphs 1 through 155 above as if fully set forth herein.

157.    One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 33, 983 N.E.2d 414, 424.

158.    QU, Defendant Lathrop, and/or Defendant Holzgrafe intentionally intruded on Plaintiff's private concerns expressed in the course of the Title IX Investigation regarding Defendant Holzgrafe and the Men's Tennis Program.

159.    QU, Defendant Lathrop, and/or Defendant Holzgrafe allowed private information shared in the course of the confidential Title IX Investigation to be broadcast throughout the Men's and Women's Tennis Programs and the athletic department at large.

160.    The underlying retaliatory motives of QU, Defendant Lathrop, and/or Defendant Holzgrafe are obvious in their actions.

161.    A reasonable person would consider the actions of QU, Defendant Lathrop, and/or Defendant Holzgrafe highly offensive.

162.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION, SAM LATHROP, and BRIAN HOLZGRAFE, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

<u>**COUNT XI**</u>
<u>**Negligent Supervision**</u>
<u>*(Against QU and Defendant Bell)*</u>

163.    Plaintiff repeats and re-alleges Paragraphs 1 through 162 above as if fully set forth herein.

164.    Illinois law recognizes a cause of action against an employer for negligent supervision of employees.

165.    On information and belief, QU and/or Defendant Bell knew or should have known that Defendant Holzgrafe had engaged in conduct that placed QU student-athletes in danger through complaints made about Defendant Holzgrafe throughout the 2016-2017 academic year.

166.    QU and/or Defendant Bell owed Plaintiff (and other students and student-athletes at QU) a duty of reasonable care to supervise, train, and discipline its employees and coaches to ensure Plaintiff (and other student and student-athletes at QU) did not experience a hostile educational or athletic environment, harassment, and retaliation.

167.    QU and/or Defendant Bell breached a duty to Plaintiff by not supervising, training, and/or disciplining Defendant Holzgrafe adequately as to applicable federal and state law and the policies of QU, which resulted in Defendant Holzgrafe removing and suspending Plaintiff from the Men's Tennis Program in retaliation for cooperating with the Title IX Investigation involving Defendant Holzgrafe.

168.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION and MARK BELL, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

**COUNT XII**
**Negligent Retention**
***(Against QU and Defendant Bell)***

169.   Plaintiff repeats and re-alleges Paragraphs 1 through 168 above as if fully set forth herein.

170.   On information and belief, QU and/or Defendant Bell received complaints from others concerning Defendant Holzgrafe and the Men's Tennis Program.

171.   QU and/or Defendant Bell had a duty to retain only competent, qualified, responsible and safety-conscious employees and coaches who would act in compliance with applicable federal and state laws and the policies of QU.

172.   QU and/or Defendant Bell breached a duty to Plaintiff by retaining Defendant Holzgrafe and allowing Defendant Holzgrafe to remain in a position of authority over Plaintiff despite the ongoing Title IX Investigation of which Defendant Holzgrafe was the subject.

173.   This breach of duty owed to Plaintiff then resulted in Defendant Holzgrafe removing and suspending Plaintiff from the Men's Tennis Program in retaliation for cooperating with the Title IX Investigation.

174.   This breach of duty owed to Plaintiff also resulted in Plaintiff experiencing harassment and a hostile educational and athletic environment.

175.    QU's, Defendant Bell's and/or Coach Holzgrafe's actions and omissions were willful and wanton, with complete and gross disregard for Plaintiff's safety and well-being.

176.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, loss of educational, athletic, and career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, DANIEL R. LOZIER, II, demands judgment against Defendants, QUINCY UNIVERSITY CORPORATION and MARK BELL, jointly and severally, for compensatory and punitive damages in a total sum in excess of Ten Million Dollars ($10,000,000.00), plus attorneys' fees (if applicable) and costs of this suit on such judgment pursuant to Federal Rule of Civil Procedure 54, and any other legal or equitable relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

DANIEL R. LOZIER, II, Plaintiff


By: s/ Patrick J. Sheehan, III
        One of His Attorneys

Attorneys for Plaintiff:
Patrick J. Sheehan, III | #6317916 | jr@sheehanlaw.net
William P. Sheehan | #6327880 | wps@sheehanlaw.net
Patrick J. Sheehan | #2575280 | pat@sheehanlaw.net
SHEEHAN & SHEEHAN, LAWYERS, P.C.
1215 South 4th Street
Springfield, IL  62703
(217) 544-0701