# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **BRIAN HOLZGRAFE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-3077** |
| | ) | |
| **DANIEL R. LOZIER, II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court is Defendant Daniel Lozier's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, or Remittitur. (d/e 210). On May 21, 2024, Plaintiff filed a Response in Opposition. (d/e 221). For the following reasons, Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial is DENIED. Defendant's Motion for Remittitur is GRANTED in part and DENIED in part.

Plaintiff Brian Holzgrafe, a former tennis coach at Quincy University, pursued claims against Daniel Lozier, a former tennis player at the same University. These claims, for defamation and false

light, related to a rumor regarding Mr. Holzgrafe having a sexual relationship with another tennis player he coached in 2017.

On April 4, 2024, the parties stipulated to the dismissal of Plaintiff's false light claim and proceeded to trial only on Plaintiff's defamation claim. After a four-day trial in April 2024, the jury found against Defendant Lozier, awarding $2,000,000 in general damages, $40,000 in special damages, and $874,000 in punitive damages, totaling $2,914.00. (d/e 202).

Defendant renews his motion for judgment as a matter of a law, or in the alternative moves for a new trial or remittitur. For the following reasons, Defendant's Motion (d/e 210) is Granted in part and Denied in part.

## ANALYSIS

### I.    Defendant's Renewed Motion for Judgment as a Matter of Law is Denied.

A motion for judgment as a matter of law made during trial that is denied by the Court must be renewed pursuant to Federal Rule of Civil Procedure 50(b) to preserve issues or grounds for appellate review.  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006).  A renewed motion for judgment as a matter of law should

only be granted where, in viewing the evidence in the light most favorable to the non-moving party, there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001). In making that decision, the Court draws all reasonable inferences in favor of Plaintiff, the prevailing party, and disregards Defendant's evidence which the jury did not have to believe. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012).

The Court cannot weigh evidence or make credibility determinations. *Id.* The Court must "leave the judgment undisturbed unless the moving party can show that 'no rational jury could have brought in a verdict against [it].'" *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007) (quotation omitted). In ruling on the renewed motion, the Court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b). For the following reasons, Defendant's renewed motion for judgment as a matter of law is denied.

**A. Legally sufficient evidence supports the verdict.**

Defendant renews his motion for judgment as a matter of law on Plaintiff's defamation claim regarding the statements by Mr. Lozier to his mother and girlfriend in 2017. Defendant's initial motion, filed at the close of evidence, argued Plaintiff failed to establish damages in support of his defamation claim. (d/e 198). Further, Defendant argues, given there were no compensatory damages proven, any claim for punitive damages cannot stand and Plaintiff failed to establish the elements necessary for his defamation claim. *Id.* Plaintiff, in turn, argues damages were clear, given the testimony provided by Plaintiff and other witnesses.

The Court reviews the evidence in the light most favorable to the nonmoving party at this stage. The evidence at trial established Defendant was a student at Quincy University in 2017. Prior to being a student at the University, Defendant developed a relationship with the Plaintiff, who was a tennis coach, from their interactions at various tennis camps. Defendant decided to attend Quincy University and play for the Plaintiff who was the head coach of both the men's and women's teams in 2017.

By 2017, Plaintiff's and the Defendant's relationship had soured. This friction was due in part to Defendant not playing in

various tennis matches. In addition, Defendant believed Plaintiff was angry with him about the injury of his girlfriend, Abby Moore, who was also on the women's tennis team. Ms. Moore broke her ankle while practicing on a basketball court with the Defendant.

In April 2017, various rumors were circulating about the tennis program and especially Plaintiff, who was the head coach. Defendant admittedly spoke to another tennis team member, Danyil Vayser, who Defendant testified told him a rumor about the Plaintiff and another tennis player, specifically that Plaintiff had had sex with a female tennis player ("Jane Doe") while on spring break.

After this conversation, Defendant repeated this information to two people, his mother, Cindy Lozier, and his girlfriend, Abby Moore. Defendant testified that his mother told him to "keep his mouth shut" and that Abby said she wouldn't tell anybody else. However, Cindy Lozier called the University and reported the rumor.

This was not the first time Mrs. Lozier had called Quincy University. Rather, she called on at least two occasions previously when there were issues with her son. One occasion involved Defendant having a problem with his roommate. Mrs. Lozier called again when she could not locate the Defendant, her son, for

approximately 3 hours and had the director of safety and security locate him. The Director of Safety and Security, Sam Lathrop, did so and told Defendant to call his mother.

Abby Moore was the best friend of Jane Doe, the female tennis player at the center of this rumor. Although Abby told Defendant she would not say anything, Abby told Jane Doe that a rumor was circulated Jane Doe was sleeping with the tennis coach. This disclosure resulted in a confrontation during tennis practice where the rumor was made more public. Thereafter, a Title IX investigation was conducted and both Defendant and Plaintiff's voluntarily departed the University.

Plaintiff, his wife, and friends all testified as to the changes in Plaintiff after this rumor was publicized. Specifically, Plaintiff testified he was depressed and withdrawn and felt isolated. Plaintiff was not able to coach tennis anymore and lost out on financial opportunities and the opportunity to be an assistant coach of his son's tennis team. Plaintiff's wife testified to Plaintiff's depression and his pulling away from their life and their family. Additionally, friends of Plaintiff testified to the changes they saw in Plaintiff's personality and Plaintiff's ability to enjoy hobbies or life generally.

A review of the evidence presented shows a rational juror could find Plaintiff has proven damages to his mental state, reputation, and financial resources. Plaintiff clearly proved the damage that this rumor inflicted on his life and the toll it took on him. Given the evidence presented to support the jury's finding of compensatory damages, this Court also declines to enter judgment on Defendant's behalf as to punitive damages.

## II. A New Trial is Not Warranted as the Verdict Was Not Against the Manifest Weight of the Evidence.

The new trial standard differs from the standard for judgment as a matter of law. "'A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party.'" *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018); *see also Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 730 (7th Cir. 2013).

Unlike the judgment as a matter of law standard, when assessing whether the verdict was against the manifest weight of the evidence, the Court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and

the comparative strength of the facts put forth at trial." *Mejia v. Cook Cty.,* 650 F.3d 631, 634 (7th Cir. 2011). The Court considers all the evidence presented, disregarding only evidence "'reasonable persons could not believe'" because that evidence "'contradicts indisputable physical facts or laws.'" *Id.* at 633.

Though the standards differ, the same reasons set forth above for denying judgment as a matter of law also support the denial of a new trial. Considering all the evidence presented by both sides at trial, the weight of the evidence, and the witnesses' credibility, the Court finds that Plaintiff's claim against Defendant was fully supported.

In his Motion for New Trial, Mr. Lozier argues that the following are grounds for a new trial: (1) the Court erred in not applying the innocent construction rule; (2) the Court erred in not applying actual malice to evidentiary findings; (3) the Court erred in allowing testimony and damages related to unforeseeable republications by third parties; (4) the Court erred in not requiring proof of actual malice to support an award of punitive damages; (5) the Court erred in allowing unauthorized third-party replications and privileged communications; (6) the Court erred in allowing hearsay and indirect

evidence of reputational harm; (7) the Court erred in allowing the awarded damages as they are grossly excessive and disproportionate; (8) the Court erred in allowing the punitive damages as they are constitutionally excessive; and (9) the Court erred in allowing potential juror misconduct. In his alternative Motion for Remittitur, Mr. Lozier requests that this Court reduce the compensatory and punitive damages awards.

**A. There is no innocent construction of Defendant's comments to his mother and girlfriend.**

Defendant contends that the Court committed error in not applying the innocent construction rule. A statement is defamatory if it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." *Tuite v. Corbitt*, 224 Ill. 2d 490, 511 (2006). Illinois recognizes five categories of statements that are defamatory *per se*. One of those five categories is relevant here, specifically, statements imputing adultery or fornication. *Id.* However, even if a statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is

reasonably capable of an innocent construction. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 103 (1996).

The Illinois Supreme Court has held that a statement "is to be considered in context, with the words and their implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable *per se*." *Chapski v Copley Press*, 92 Ill. 2d 344, 352 (1982).

Defendant argues the statements made by him to both his mother and his girlfriend were subject to an innocent construction and his counsel did not intend to admit liability as to defamation. The Court is unpersuaded. Per Defendant's post-trial motion, Mr. Craven, when specifically questioned by the Court as to whether he was conceding liability as to defamation said, "On the ultimate issue of liability on that count, yes." (d/e 210, p. 5).

Substitute counsel for the Defendant now urges this Court to believe what prior counsel *meant* was intended for the prior libel claim against Defendant, rather than what prior counsel actually *said* about the defamation claim to the Court. (emphasis added).

Regardless, there is no innocent construction of Defendant's disclosures to both his mother and girlfriend.

Defendant argues that he was simply conveying statements he had heard to his mother and girlfriend, and he had an expectation that these conversations would remain private. As an initial matter, and, as is appropriate when considering a motion for new trial, the Court did not find Defendant's assertion of Danyil Vayser creating the rumor credible. Rather, Mr. Vayser's testimony discussing Defendant telling Vayser that he should watch out because "shit is going to hit the fan" is more credible in light of the evidence presented at trial.

Even if Defendant were told this rumor and chose to repeat it, there is no innocent construction of his words or his actions. Defendant alleges what he told his mother and Abby was something akin to "Vayser told me that Coach and [Jane Doe] had sex over spring break." The context of these words does not support an innocent construction. Defendant intended to convey a scandalous rumor to Abby Moore and his mother about his coach and another tennis player.

This rumor was not shared for investigation as Defendant argues, but rather to impugn Plaintiff's name. Further, per testimony of the witnesses at trial, the relationship between Defendant and the Plaintiff had been deteriorating for some time. An allegation of infidelity, by a coach, with a student he coaches has no other meaning than to claim that the Plaintiff was cheating on his wife with a student.

A court is not required to search for an innocent construction in the midst of a defamation claim. Further, when a defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to find an inoffensive gloss on the statement. *See Bryson*, 174 Ill. 2d at 93. (holding the use of the word "slut" has a plain and popular connotation and courts are not required to find an unnatural, but possibly innocent meaning for words where the defamatory meaning is far more reasonable).

The clear content of the statement the Defendant made unambiguously involved adultery and fornication. The Court cannot find that there is an innocent construction to be had with an allegation of infidelity which is made worse by the existence of a coach and student athlete relationship.

**B. The Court did not err in its determination that Plaintiff is a private figure, rather than a public one.**

Defendant argues this Court erred by not determining whether Plaintiff should be classified as a public figure. More specifically, the Court erred by not stating explicitly that Plaintiff is not a public figure. This argument is seemingly an attempt to ignore what prior counsel for the Defendant conceded in briefing and in open court. That concession was, notably that Defendant "believes Holzgrafe is a "private figure." This position was held by both parties, and the Court agreed. (d/e 120, 138).

Although Defendant argues it was incumbent on the Court to decide whether Holzgrafe was a "public figure," prior counsel for the Defendant, when the Court specifically asked for clarification as to his position, did not raise this argument. If counsel for the Defendant wished to raise this argument, he was free to do so. However, the Court is not responsible for consideration of every argument as to an issue not raised by counsel. The Court does not have a duty to argue on behalf of a represented party.

Counsel for the Defendant had multiple opportunities in briefing and in open court to raise the public figure argument with

the Court but provides it for the first time in post-trial briefing. Counsel for the Plaintiff argues this argument was waived and believes it was waived given Defendant conceded Holzgrafe was a private figure under defamation law.

Even if this argument were not waived, there is no evidence that Plaintiff was a public figure. In *Gertz v. Robert Welch, Inc.*, the Supreme Court introduced the classification of limited purpose public figures. This occurs "[w]here individuals 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,' they become public figures for the limited range of issues associated with those controversies." 418 U.S. 323, 351 (1974).

Illinois courts apply a three-part test to determine whether a person qualifies as a public figure. *Jacobson v. CBS Broad., Inc.,* 2014 IL App (1st) 132480, ¶ 31. First, there must be a public controversy, which means an issue that is being debated publicly, the outcome of which impacts the general public or some portion of it in an significant way. A matter of general public interest or concern is not sufficient. Second, the plaintiff must have undertaken some voluntary act seeking to influence the resolution of the issues

involved. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.* (internal citations omitted).

Even assuming a public controversy existed at the time of the defamatory statement, there is no evidence that Plaintiff met the second prong of the test by voluntarily acting to "influence the resolution of the issues involved" in that controversy. Limited purpose public officials "thrust themselves to the forefront of particular public controversies." *Gertz*, 418 U.S. at 345.   There is no question that Plaintiff did not inject himself into any particular public controversy. Nor did he provide any commentary to newspapers or the like.

Rather, a rumor was spread about the Plaintiff, he became aware of these rumors, denied them, and cooperated with an investigation. Plaintiff made no public speeches, did not provide commentary to any newspaper or other media. Instead, Plaintiff avoided all publicity during the time this rumor was circulating. Plaintiff did not seek to influence a matter of public controversy, so he is not a limited purpose public figure.

The Court did not err in failing to provide the above limited public figure analysis. This is particularly true as prior counsel conceded Plaintiff was a private figure, and there is no evidence that Plaintiff thrust himself into the forefront of any controversy.

**C.    The Court did not err by refusing to exclude evidence of republication of Defendant's defamatory statements.**

Defendant argues the Court should have excluded any testimony and damages related to republications by third parties. Specifically, Defendant argues that these republications did not stem from a first public disclosure and the republications by Abby Moore and Defendant's mother were not reasonably foreseeable.

A speaker who makes a defamatory statement is liable for republications that are the "reasonably foreseeable consequences of his actions." *Kallemeyn Collision Ctr., Inc. v. Standard Fire Ins. Co.*, 628 F Supp. 3d 769, 778 (N.D. Ill. 2022). Defendant argues the "confidential communications" with his mother and girlfriend where he told each that "Vayser told me that Coach and [Jane Doe] had sex over spring break" cannot meet the standard for foreseeability as these comments were supposed to remain private.

Defendant thought these conversations were private, but it is reasonably foreseeable each of the individuals he spoke to would tell another this specific information. Mr. Lozier's girlfriend at the time these statements were made, Abby Moore, was the "best friend" of the female tennis player also at the center of this rumor. No matter what assurances or promises were made by Moore, it is reasonably foreseeable that a fellow student of the same age and experience as Ms. Moore, would tell her best friend a rumor being circulated about her best friend's sex life. This is especially true when that rumor involves Ms. Moore's best friend having sex with their tennis coach.

It was also reasonably foreseeable that Cindy Lozier, Defendant's mother would contact the school about this rumor. Cindy Lozier had a history of complaining to Quincy University when her son brought issues to her attention that were non-scholastic in nature. (d/e 103, p. 7). Further, Mr. Lozier admitted that his mother previously ensured people were "investigated" if they had issues with her son and had previously spoken to other parents of other students about Mr. Holzgrafe, specifically. *Id.* These facts support a finding that the re-publications of Mr. Lozier's defamatory statements were reasonably foreseeable and a natural or probable consequence.

Defendant last argues because the defamatory statements were made in private conversations rather than in the public before a large group, that it was not reasonably foreseeable republication would occur. Specifically, Defendant distinguishes his conduct from the defamatory conduct in *Tunca*. In *Tunca,* a defamatory statement was made loudly in the public hallways of a hospital versus the situation here, where the Defendant called his mother on the phone and spoke to his girlfriend in a local restaurant. *Tunca v Painter*, 965 N.E. 2d 1237, 1263 (Ill App. Ct. 2012) (d/e 210, p. 8).

Defendant did not shout this rumor outside, at the tennis courts, or at a large meeting at Quincy University. That fact, however, does not make republication by his mother to the University or by Ms. Moore to her best friend, any less foreseeable based on the above analysis. Therefore, the Court did not err in allowing the testimony as to republications as they were each a reasonably foreseeable consequence.

## D.  The jury was instructed appropriately as to punitive damages and malice.

Defendant also argues the Court committed error in not instructing the jury on actual malice and not requiring Plaintiff prove

actual malice before seeking damages. In support, Defendant cites
Seventh Circuit caselaw stating "the Illinois Supreme Court has
never approved the recovery of punitive or presumed damages on less
than actual malice." *Republic Tobacco Co. v. N Atl. Trading Co.,* 381
F.3d 717, 733 (7th Cir. 2004). Plaintiff, in response, cites an Illinois
Supreme Court case arguing the Illinois Supreme Court speaks
directly to an award of punitive damages where actual malice has not
been established. *See Imperial Apparel, Ltd. v. Cosmo's Designer
Direct, Inc.,* 227 Ill.2d 381, 395 (2008).

In *Imperial*, the Illinois Supreme Court discussed the question
of whether speech which addresses a matter of public concern has
on the standards that must be satisfied in order to recover punitive
damages. The Supreme Court noted "where the defamatory
statements involve a purely private matter…an award of punitive
damages is not dependent upon actual malice being established. *Id.
citing Mullen v. Solber*, 271 Ill. App. 3d 442, 445 (1995) ("Where words
are held to be actionable *per se*, malice is implied and punitive
damages may be awarded on the basis of implied malice.")

Here, as this Court has discussed and the parties have
conceded, Plaintiff is a private figure. Therefore, there is no

requirement that the alleged defamatory statement was made with actual malice. Further, there can be no question that the defamatory statement in this matter was indeed a private matter, as it related to an alleged affair between a tennis coach and his student. Given the private nature of the matter, punitive damages are not dependent on actual malice being established, so the Court did not err.

**E.  The Court did not err in allowing evidence of Third Party republications with respect to the Title IX investigation.**

The Court has already discussed the admissibility of third-party republications in this matter and the foreseeability of those republications as they related to Defendant's mother and girlfriend. The same analysis is instructive here, where the Court has already found that the republications by Defendant's mother to Quincy University to be a reasonably foreseeable consequence from Defendant's defamatory statement.

The republications by Defendant's mother are foreseeable given Cindy Lozier's prior calls to the University whenever the Defendant brought a problem to her attention. An investigation into Plaintiff and this alleged affair was also reasonably foreseeable, given Plaintiff was a tennis coach and the young woman he allegedly had sex with was

a student at Quincy University on the women's tennis team who
Plaintiff coached. An investigation into this matter would likely
determine whether as part of Plaintiff's employment, he violated any
rules or regulations in engaging in sexual contact with a student he
coached. Even though the Court has found these republications
foreseeable, Defendant also argues that an absolute privilege exists,
absolving him from liability.

Where absolute privilege is granted, no cause of action for
defamation lies against the person making the statement even if it is
made with malice. *Starnes v. International Harvester Co.*, 141 Ill. App.
3d 625, 653-54 (1986); see also *Zych v. Tucker*, 363 Ill. App. 3d 831,
834, 844 (2006) ("An absolute privilege provides a complete immunity
from civil action even though the statements were made with malice
because public policy favors the free and unhindered flow of such
information.")

Defendant argues any communications made to Quincy
University with respect to the Title IX investigation were absolutely,
or at a minimum qualifiedly, privileged. In support, Defendant cites
*Razavi v. Sch. Of the Art. Inst. Of Chi.,* 2018 IL App (1st) 171409
(*Razavi II*). This case is the second concerning the parties in that

matter. In *Razavi v. Walkuski*, 2016 IL App (1st) 151435 (*Razavi I*), college students who were alleged victims of crimes reported those crimes to campus security regarding another student. The appellate court was asked to determine whether the absolute privilege applies to a college student's report of sexual violence made to campus security. *Razavi v. Sch. Of the Art Inst. Of Chi.*, 2018 IL App (1st) 171409 ¶ 13. The appellate court held "an absolute privilege extends to statements made by alleged campus crime victims to campus security." *Id.* The rationale for this privilege included the goal of protecting individuals who report crimes and public policy aimed at preventing sexual assault.

In *Razavi II,* the appellate court considered the question of whether any additional republications of defamatory statements throughout an investigation were also privileged. The court found that additional republications in the furtherance of an investigation, after an initial disclosure of an alleged crime to law enforcement, or the university equivalent, were absolutely privileged. *Razavi v. Sch. Of the Art Inst. Of Chi.*, 2018 IL App (1st) 171409 ¶35.

Plaintiff argues that the disclosures by Cindy Lozier and the Defendant are not absolutely privileged and, at most, qualified

privilege applies. In citing the same case, Plaintiff argues *Razavi*'s grant of absolute privilege only applies to alleged victims of crimes and their reports to proper authorities at higher education institutions. Plaintiff argues Cindy Lozier and Defendant are also not entitled to a qualified privilege because malice was present in their republications.

The defense of absolute privilege rests on the concept that conduct, which otherwise would be actionable, must escape liability because the defendant is acting in furtherance of some socially important interest, like the investigation of an alleged crime, that is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. *Razavi v. Sch. Of the Art Inst. Of Chi.*, 2018 IL App (1st) 171409 ¶ 20, *citing Morris v. Harvey Cycle & Camper Inc.*, 392 Ill. App. 3d 399, 404 (2009).

However, here, there is no evidence that Defendant's mother was acting on the suspicion of a crime or out of an abundance of concern, societal, or otherwise. Rather, Mrs. Lozier called the University to report a rumor that her son heard on a college campus about a classmate and coach. Mrs. Lozier did not take the stand at trial, but the evidence of her and her family's strained relationship

with the Plaintiff was evident. The evidence further supports a finding that Mrs. Lozier wanted Plaintiff away from the tennis program at Quincy University to ensure the Defendant had more opportunities to play in competitive matches. Further, Defendant's argument that he was solely repeating a rumor in light of other testimony given is unpersuasive.

Even if there were a privilege which applies to Cindy Lozier and Defendant's republications, that privilege is qualified at best. Qualified privilege is lost if: "(1) false statements are made with malice or a reckless disregard for their truth, (2) the statements are not limited in scope, or (3) publication is not limited to proper parties." *Zych v. Tucker*, 363 Ill. App. 3d 831, 835 (2006) (citing *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 27 (1993)).

Taking the evidence presented at trial and the credibility of the witnesses into consideration, Defendant and his mother either acted with malice or a reckless disregard in spreading this rumor to Quincy University officials.

**F. The Court did not improperly admit hearsay evidence concerning Plaintiff's reputation.**

Defendant argues generally that hearsay evidence was admitted regarding the damage to Plaintiff's reputation. However, Defendant does not point to any specific witness or any specific testimony. Rather, Defendant argues that "certain witnesses" speculated about the perceptions and statements of others.

Defendant does not provide who these witnesses were. Given no examples were specified by Defendant, the Court cannot say with specificity why certain testimony was allowed. However, to the extent Defendant is referring to testimony by the Plaintiff, the Court did not err in allowing Plaintiff to describe his experience after this rumor was made public.

During the trial, Plaintiff testified about how he was treated not only by family members, but the public, after these allegations were generally known. Plaintiff testified he did not have opportunities to coach at clubs, summer camps, or as an assistant coach at his children's school. Plaintiff became withdrawn and was not contacted as often by friends. Generally, he was treated differently by those around him after this allegation surfaced.

The Court did not err in allowing Plaintiff to discuss his experiences after this rumor surfaced and the impact on his life and

livelihood. As to any other allegation of hearsay that was improperly admitted, the Defendant has not provided enough specific information to the Court to provide any additional analysis.

**G. Defendant does not provide the Court with enough specificity of potential juror misconduct or impartiality to make a determination.**

In Defendant's final argument, Defendant raises the possibility of incidents that raise concerns regarding juror misconduct or lack of partiality. Counsel for the Defendant does not specify what these incidents may have been, nor does Counsel indicate how the Court handled any specific situation inappropriately.

Without further argument, the Court cannot make a ruling on what this alleged misconduct may have been. Therefore, the Court will not address this argument any further.

### III.   Defendant's Motion for Remittitur is Granted in part and Denied in part.

As the Court noted earlier, on April 11, 2024, the jury returned its verdict, awarding $2,000,000 in general damages, $40,000 in special damages, and $874,000 in punitive damages, totaling $2,914,000.00. (d/e 202). Defendant asserts that the awarded

damages are grossly excessive, disproportionate, and constitutionally excessive. (d/e 210, pp. 12-14). Specifically, Defendant asks the Court to reduce both Plaintiff's compensatory and punitive damages.

### 1. The Court Grants Defendant's Motion to Reduce Compensatory Damages.

Defendant makes various arguments concerning the awards of compensatory and punitive damages. Concerning the compensatory damages award, Defendant argues that, given the presumed damages at issue in this case, the jury award in this matter is excessive, and the jury's verdict is against the clear weight of evidence and will result in a miscarriage of justice.

In support, Mr. Lozier cites a Seventh Circuit case wherein the appellate court found that remittitur was appropriate given the facts of the matter. *See Republic Tobacco Co.,* 381 F. 3d 717, 734 (7th Cir. 2004). Specifically, Defendant explains the Seventh Circuit held a district court abused its discretion in allowing over $3 million in presumed damages where the case lacked "proof of economic injury", and the defamatory statements were publicized to "a relatively limited audience."

Defendant does not apply the *Republic* rationale to the facts in this case and simply includes the case for the Court's consideration. Aside from also citing a Seventh Circuit case that provides the three questions a district court must consider on remittitur, *see Naeem v. McKesson Drug Co.,* 444 F.3d 593, 611 (7th Cir. 2006), this is the majority of Mr. Lozier's argument concerning the award of compensatory damages. *See Naeem v. McKesson Drug Co.* (a district court limits its inquiry to three questions: "whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that is merely a product of the jury's fevered imaginings or personal vendettas; and whether the award is roughly comparable to awards made in similar cases.").

Plaintiff, in response, argues Defendant utilizes the incorrect standard for determining whether a compensatory damages award is inappropriate, and that Illinois law applies. This Court agrees. Additionally, Plaintiff argues, even if the Court were to apply the three-question approach in *Naeem*, which requires analysis of comparable awards in similar cases, Plaintiff is entitled to the jury's awarded damages.

In *Rainey v. Taylor,* the Seventh Circuit clarified when a federal jury awards compensatory damages in a state-law claim, state law determines whether that award is excessive. *See Rainey v. Taylor*, 941 F. 3d 243, 254 (7th Cir. 2019) citing *Smart Mktg. Grp. v. Publ'ns. Int'l Ltd.,* 624 F.3d 824, 832 (7th Cir. 2010). Remittitur is appropriate "only when a jury's award falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience." *Klingelhoets v. Charlton-Perrin*, 368 Ill. Dec. 291 (Ill. App. Ct. 2013). Conversely, remittitur "should not be ordered if the award falls within the flexible range of conclusions which can reasonably be supported by the facts." *Id.*

The evidence at trial proved Plaintiff was no longer able to coach student athletes at the collegiate or club level, lost his part time job, was humiliated in the public's eyes, and was accused of cheating on his wife with a student he coached. Although this evidence shows that Plaintiff has suffered damages as a result of Defendant's tortious behavior, the damages amount falls outside of reasonable compensation.

Plaintiff, while suffering emotional damages, and that to his reputation, suffered no physical damages or severe economic damages as the result of Defendant's behavior. Plaintiff did lose a part-time job, but was still employed by his family's construction company, and able to support his family's needs. The jury clearly took into consideration the mental suffering, personal humiliation, and standing in the community. However, the amount awarded is excessive given the evidence presented by the Plaintiff.

The compensatory damages award does shock the judicial conscience in terms of the sheer amount given the mostly emotional damages evidence.  A $2 million award where there was no physical injury is indeed excessive, and the Court will decrease the compensatory damages award by 50%, to $1 million.

### 2. The Court Denies Defendant's Motion to Reduce Punitive Damages.

"In reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur

should be ordered." *Browning-Ferris Indus. Of Vermont, Inc. v Kelco Disposal, Inc.,* 492 U.S. 257, 279 (1989).

### a. Due Process Evaluation

Because punitive damages are "retributive in nature," they must comply with principles of due process. *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019). To determine whether a punitive damage award complies with due process a court should consider: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered and the punitive award; and (3) the difference between the award authorized by the jury and the penalties imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).

Defendant focuses on reprehensibility and notes the following should be considered: (a) whether harm was physical as opposed to economic; (b) whether tortious conduct demonstrated indifference or reckless disregard to health or safety; (c) whether the target of the conduct was financially vulnerable; (d) whether the conduct involved was repeated or merely isolated actions; and (e) whether the harm was the result of intentional malice or deceit. *State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003).

Specifically, Defendant argues Plaintiff suffered no physical harm, Plaintiff's health or safety was not impacted, Plaintiff was not financially vulnerable, Defendant's actions were isolated, and Defendant's actions showed no malice. In response, Plaintiff argues that Defendant's actions were indeed reprehensible by the creation of a rumor of infidelity that Defendant knew was false and was spread.

The evidence at trial showed that Plaintiff did not suffer any physical injury. However, Plaintiff's mental health was indeed affected by the rumor he slept with a tennis player he coached while married. Plaintiff became withdrawn, depressed, and testified his life was destroyed. What had always been a constant in his life, tennis and coaching, were no longer options based on the spreading of this rumor. This rumor was the basis for a University investigation after Defendant's mother informed Plaintiff's employer, which further spread this information to the public culminating in articles written about this matter and the subsequent litigation.

During trial, no evidence was presented of any indifference to Plaintiff's personal safety or that Plaintiff was indeed more financially vulnerable than any individual who lost his job. As this Court has

discussed earlier, Defendant had conversations with both his girlfriend and his mother, told them each this rumor, which was then repeated to others. Although the two conversations Defendant admits having are seemingly isolated incidents, his girlfriend's best friend was the tennis player Plaintiff was allegedly having an affair with. Almost immediately after Defendant's disclosure, this rumor was circulated through the tennis team and was discussed with the Plaintiff at a tennis practice. The repetition of information of this nature involving an athletic team was almost inevitable and cannot be described as isolated.

Lastly, the parties disagree whether Defendant's actions were malicious in nature or evocative of ill will. A review of the evidence, including testimony by the parties and other members of the tennis team, show clear friction between the parties, as well as Defendant's parents. Defendant testified that he did not spread any rumor purposely and was just repeating what was told to him. However, Defendant's mere repetition argument was disputed by Danyil Vayser in part. This Court is unpersuaded by this argument and finds that Defendant's actions were indeed reprehensible in light of the specific factors in this matter and did indeed cause significant harm to

Plaintiff's mental health and reputation and this award does not violate substantive due process principles.

In reviewing the disparity or ratio between the punitive award and the harm or potential harm suffered by the Plaintiff, the Court finds the punitive damages do not exceed acceptable limits. The jury was tasked with specifying an appropriate amount of compensatory damages and they did so in light of the evidence presented. The Court has reduced the compensatory damages amount to ensure it was equitable to the amount of damages suffered. This is true given Plaintiff's damages are more emotional in nature than physical but also include humiliation and harm to his reputation in a very close-knit community. Further, Plaintiff testified he was no longer able to enjoy a very specific and large aspect of his life anymore. The punitive damages take this close-knit community, and the ruining of Plaintiff's reputation into account and there is no disparity.

Regarding the difference between the award authorized by the jury and the penalties imposed in comparable cases, Defendant again does not provide any argument about the instant award and comparable civil penalties, rather, just that those awarded to Plaintiff are excessive. Plaintiff, in turn, argues that Defendant has therefore

forfeited this argument and provides the *Leyshon* case in support of a punitive damage award of the same type. *See Leyshon v. Diehl Controls N. Am., Inc.,* 407 Ill. App. 3d 1 (2010) (affirming a trial court's determination to grant remittitur of punitive damages from $10 million to $6 million in a defamation case).

The Court concludes these punitive damages did not violate due process and, therefore, a new trial, or remittitur is inappropriate.

**b. The Court Denies Defendant's Motion to Reduce Punitive Damages under the Illinois Common Law Standard.**

Defendant's motion is devoid of argument under the Illinois common law standard for determining whether a punitive damages award is appropriate. However, the Court will address this nonetheless as it is required to do so.

Juries are charged with the determination of the amount of punitive damages because the amount depends so closely upon the fact-finding by the jury. *Blount v. Stroud,* 395 Ill. App. 3d 8, 22 (2009). An award of punitive damages will not be reversed unless it must have been the result of passion, partiality, or corruption. *Id.* As the jury's award of punitive damages is predominately a factual issue,

the court will not reverse the award unless it is against the manifest weight of the evidence. *Id.*

The relevant circumstances to consider in reviewing a jury award of punitive damages include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant and the defendant's potential and future liability.

       i.    The Nature and Enormity of Defendant's Wrong Support an Award of Punitive Damages.

"While all acts which give rise to punitive damages are willful and wanton, some of those acts are clearly more reprehensible than others. The egregiousness of the act should be reflected in the amount of the award. Recognizing that punitive damages are in the nature of a criminal sanction, we are simply saying that the punishment should fit the crime. An award which is disproportionate to the wrong serves none of the purposes of punitive damages and is excessive." *See Hazelwood*, 114 Ill. App. 3d 703, 712-713 (1983).

Here, Defendant spread a rumor to his girlfriend and his mother about his tennis coach. Although the spreading of a rumor is generally thought to be innocuous; this rumor was that Defendant's tennis coach was having an affair with a student tennis player. This

female tennis player was also the best friend of Defendant's girlfriend. Lastly, this rumor came on the heels of Defendant and his parents having a difficult relationship with the Plaintiff at issue.

The spreading of this rumor resulted in an investigation at the University where Plaintiff was a coach and Defendant was a student. Plaintiff ultimately left his employment there and has been unable to work as a coach since. Defendant initially brought the instant case against Quincy University and Plaintiff alleging violations of Title IV. (d/e 1). During the pendency of this case, Plaintiff filed a counterclaim against the Defendant for defamation and false light. Although Defendant's claims were settled, the nature of the allegations were further publicized after the initial spreading of this rumor, given Defendant's lawsuit against Quincy University and Plaintiff, causing further damage to Plaintiff's reputation.

The Court sees nothing improper about the jury's punitive damages award in light of this evidence.

          ii.     Defendant's Financial Status Supports an Award of Punitive Damages.

Defendant's motion mentions "on information and belief," the trial lacked substantive testimony regarding Defendant's financial

status. However, evidence at trial was elicited from the Defendant concerning how much money he had in his bank account, the value of the vehicle Defendant owns, his ability to pay off student loans, and his status as the beneficiary of a trust that included his settlement amount from his claims recovered against Quincy University.

Defendant only argues the punitive damages award is excessive and must be reduced. Defendant cites cases in support of his proposition that information regarding financial status is needed for an appellate court to review a challenge of punitive damages.

During the trial, the evidence showed that the largest asset Defendant has is a trust under the control of his parents which he described as having less than 50% of the $400,000 settlement he received in his lawsuit against Quincy University. Specifically, Defendant testified he received $250,000 after attorney's fees and less than $125,000 was left given his defense of this matter against Plaintiff Holzgrafe.

"Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages." *Deal v.*

*Byford*, 127 Ill. 2d 192, 204-205 (1989). The jury was presented with evidence of Defendant's financial status, the fact he graduated with an undergraduate degree, a law school degree, and had some money from a previous settlement. Given this information, the jury determined that this was an appropriate amount of punitive damages to punish Defendant for his behavior and the spreading of a false rumor about the Plaintiff which caused the Plaintiff damage.

> iii.    The Potential Liability of Defendant Supports an Award of Punitive Damages.

This action began when Mr. Lozier filed suit under Title IX alleging a hostile educational and athletic environment, against Quincy University and various individuals, including Mr. Holzgrafe. Approximately one year later, Mr. Holzgrafe brought counterclaims against Mr. Lozier for defamation and false light. In February and March 2022, Mr. Lozier moved to dismiss the claims which formed the basis of the original lawsuit as the University defendants and Mr. Lozier settled out of court.

This settlement of $400,000 between the Quincy University and Defendant Lozier, resulted in the dismissal of the initial claims Lozier filed against Quincy University and various individuals. In May 2022,

the Court dismissed all of the initial claims with prejudice except Counts III and VIII against Mr. Holzgrafe, which were dismissed without prejudice.

On February 5, 2024, the Court realigned the parties to simplify and streamline this matter, with Brian Holzgrafe being referred to as the Plaintiff and Daniel Lozier, II, as Defendant. Therefore, there are no other prior suits that resulted in punitive damages, nor is the Court aware of any others that are pending.

There is no evidence that the jury's punitive damages award was the product "of passion and prejudice, or not rationally connected to the evidence." *See American Nat. Bank & Trust Co. of Chicago v. Regional Transp. Authority*, 125 F.3d 420, 437 (7th Cir. 1997). The jury was presented with evidence of Defendant's actions and his financial information. Using that information, the jury decided to punish Defendant for his behavior. That is the purpose of a punitive damages award, and this Court will not second-guess the jury's decision as to punitive damages. The Court therefore finds the jury's punitive damages award is appropriate and declines to reduce the punitive damages award.

## IV.  CONCLUSION

For the reasons stated, Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial is DENIED. Defendant's Motion for Remittitur is GRANTED in part and DENIED in part.